**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>Plaintiff,<br><br>v.<br><br>Paul James Dellinger and Brian Luke Bonetto,<br><br>Defendant. | No. CR-13-00065-PHX-DGC<br><br>**ORDER** |

On June 8, 2010, a grand jury indicted Defendants Paul James Dellinger and Brian Luke Bonetto, both of whom worked as federal prison guards. The indictment alleges that Defendant Dellinger tackled and punched an inmate, violating his rights under the color of law in violation of 18 U.S.C. § 242. Doc. 1. It also alleges that Defendant Bonetto witnessed the attack and that both Defendants failed to report the incident accurately and thereby obstructed justice in violation of 18 U.S.C. § 1519. *Id*. Defendants have filed motions to exclude oral and written statements they made after the incident. Docs. 33, 35. On August 14, 2013, the Court held an evidentiary hearing at which both Defendants and two other correctional officers testified. For the reasons that follow, the Court will deny the motions.

**I.   Legal Standard.**

In *Garrity v. State of New Jersey,* 385 U.S. 493 (1967), the Supreme Court held that, absent a knowing and voluntary waiver, incriminating statements made by law enforcement officers to other law enforcement officers under the threat of termination are

1  inadmissible in a subsequent criminal trial.  Defendants argue that the statements they
2  made in the aftermath of the incident were coerced under the threat of job loss and should
3  therefore be excluded under *Garrity*.

4  Although the government ordinarily bears the burden of proving the voluntariness
5  of statements made to law enforcement officers, neither party has identified Ninth Circuit
6  law addressing the burden of proof in the *Garrity* context.  Several other circuits have
7  held that a *Garrity* claim depends on a showing of coercion.  *See*, *e.g.*, *United States v.*
8  *Trevino*, 215 Fed. Appx. 319, 321 (5th Cir. 2007) ("Although the Supreme Court has not
9  recently revisited the *Garrity* line of cases, a number of the circuits have focused on the
10 'coercion' issues emphasized by the Court in those cases, making it a claim dependent on
11 such a showing.") (citing *United States v. Vangates,* 287 F.3d 1315, 1321-22 (11th Cir.
12 2002) (holding that the defendant's failure to show that her belief about coercion was
13 objectively reasonable is fatal to her claim); *Chan v. Wodnicki,* 123 F.3d 1005, 1009-10
14 (7th Cir. 1997) ("[Plaintiff], who has the burden on [what actions can constitute
15 coercion,] also has not been able to find such authority")) (some citations omitted).  The
16 D.C. Circuit has held that coercion exists when a defendant "in fact believed his . . .
17 statements to be compelled on threat of loss of job and this belief [was] objectively
18 reasonable." *United States v. Friedrick*, 842 F.2d 382, 395 (D.C. Cir. 1988).

19 The Court agrees that coercion is key to a *Garrity* claim, and finds the two-part
20 test adopted by the D.C. Circuit in *Friedrick* to be reasonable.  Because Defendants seek
21 relief under *Garrity*, and the availability of that relief turns on their subjective beliefs and
22 the objective reasonableness of those beliefs, the Court concludes that Defendants bear
23 the burden of showing coercion – that they believed their statements to be compelled on
24 threat of job loss and that their belief was objectively reasonable.

25 **II.     Evidence.**

26 The first witness at the suppression hearing was Officer Daryl McCoy.  Officer
27 McCoy testified that he operated the video camera for a recorded after-incident inquiry.
28 He testified that it was policy to create such a video after use-of-force incidents.  Officer

1  McCoy testified that approximately one hour elapsed between the incident and the
2  filming of the video, which he testified took place at approximately 7:30 or 7:45 p.m.  In
3  addition to the video, Officer McCoy testified that Lieutenant Daniel Iverson told
4  Defendants to put together written reports by the end of their shift.  Officer McCoy was
5  responsible for collecting those reports and conveying them to Iverson.  He testified that
6  Defendants were not suspected of any wrongdoing at that time of the reports and that
7  prison staff is routinely asked to submit reports by the end of shift.  He stated that he did
8  not recall anyone telling Defendants that they needed to hurry in the drafting of their
9  memoranda, but there was pressure to finish quickly because the shift was ending.
10 Finally, he testified that he did not know what would happen to an officer who refused to
11 write a report, but he assumed that there would be some kind of discipline and possibly
12 firing.

13 Lieutenant Iverson testified that he directed the creation of the after-action video
14 and requested reports from both Defendants.  When asked what would have happened
15 had Defendants failed to comply with the request, he responded that he did not know
16 what would happen, but that he has seen officers disciplined for insubordination.  He
17 testified that neither Defendant ever requested to speak with an attorney or a union
18 representative and that there was no discussion of their Fifth Amendment right to remain
19 silent.  He stated that if Defendants needed more time to complete their reports they could
20 have asked to stay overtime and he would have granted the request.

21 Defendant Bonetto testified that correction officers "do what the Lieutenant says"
22 and that he believes he could have been subject to discipline for refusing to complete a
23 report.  Specifically, he stated that he believed he would probably be "written up."  On
24 cross-examination, Defendant Bonetto acknowledged that he was familiar with report
25 writing and had written reports previously.  He testified that he knew a report would be
26 required even before Lieutenant Iverson requested him to write one.  Indeed, he began
27 drafting the report at about 6:30 or 6:45 p.m., approximately 20 to 30 minutes after the
28 incident and before Iverson had asked him to write a report.  He did not ask for additional

time to write the one-paragraph report or to see a lawyer or union representative.

Defendant Dellenger testified that Lieutenant Iverson told him to write a report and that he believed he would have been disciplined or possibly fired if he refused. He testified that he had other duties to attend to while he was writing his report, including supervising an area that included more than 100 inmates. He testified that after he completed the report, he was contacted by Lieutenant Iverson and asked to reduce the level of offense he was charging against the inmate with whom he had the altercation. He complied with the request and, as a result, deleted from his report a reference to the inmate biting him during the altercation. Defendant Dellenger acknowledged that he never asked to see an attorney or a union representative, never invoked his Fifth Amendment rights, and never asked for more time to complete his one-paragraph report. He stated that there was no accusation of wrongdoing that night and that he knew he would need to draft an incident report even before he was ordered to do so. On re-direct, Defendant Dellenger reiterated that he believed he would face severe discipline if he did not complete the report.

**III.   Analysis.**

In *United States v. Cook*, 526 F. Supp. 2d 1 (D.D.C. 2007), a Deputy United States Marshal was accused of using excessive force against an inmate. The victim submitted a complaint against the deputy and, upon receiving the complaint, the deputy's supervisor ordered him to complete a report. The deputy moved to suppress statements in the report under *Garrity*. After an evidentiary hearing, the court determined that the deputy's claim that he would be fired if he did not complete the report was dubious because: (1) he was unaware of the policy for discipline for failure to write a report, and (2) he never knew of anyone who had been terminated on these grounds. *Id*. at 7. Though he testified that another officer had been threatened with termination for not completing a report, he could not recall if he learned of that threat before or after he wrote his own report. *Id*. The deputy "did not object, refuse, or request representation." *Id*. Additionally, the court found that a belief he would be terminated, even if subjectively held, would not be

objectively reasonable because it was contrary to the published disciplinary policies. *Id*. at 8. The court concluded that "both the possibility of prosecution and the possibility of termination were far too tenuous to support a finding that he was between 'the rock and the whirlpool' at the time he filed his reports." *Id*. (quoting *Garrity*, 385 U.S. at 498).

*Cook* also found that there was no authority for applying *Garrity* to statements made by an employee when no criminal investigation had been initiated against him, despite the fact that a civilian complaint against the deputy had already been received. *Id*. The court concluded a "tremendous and unnecessary administrative burden" would arise if *Garrity* were applied immediately upon receipt of every complaint or every request to write a report. *Id*. at 9.

The Court finds *Cook* to be directly on point. While both Defendants in this case were required to complete their reports quickly at the end of shift, they presented little evidence that they subjectively believed they would be fired if they refused to comply. Defendant Bonetto believed he would probably be "written up" for failure to write the report. Defendant Dellenger testified that corrections officers "do what the Lieutenant says" or face "severe discipline." While both Defendants testified that firing was a possibility, neither Defendant claims that he was ever threatened with discharge or knew of instances where employees had been discharged for refusing to complete reports. Like the testimony in *Cook*, Defendants' evidence amounts to little more than speculation that they would have been fired for failure to prepare their reports.

Further detracting from any suggestion of coercion is the fact that both Defendants knew reports would be required. Both acknowledged that reports were routinely created after use-of-force incidents, both had training in writing such reports, and both had written reports previously. Indeed, Defendant Bonetto began drafting his report before being asked to do so by Lieutenant Iverson. Although there was time pressure to get the reports completed before the end of shift, neither Defendant requested additional time, a request that would have been granted by Iverson. Nor does the Court find that Defendants were afforded insufficient time to complete their short, one-paragraph

reports.

Under these circumstances, the Court finds that Defendants have failed to show that they subjectively believed they would be terminated if they failed to complete the reports. Nor have they shown that such a belief would have been objectively reasonable. Because Defendants have not shown that their statements were coerced, they have failed to carry their burden of showing the reports should be suppressed.

Two additional grounds support the Court's conclusion.

First, as in *Cook*, these reports were requested before there was any suspicion of wrongdoing or accusations levied against Defendants. Defendants never asked to see counsel or a union representative or invoked their Fifth Amendment rights. The Court agrees with *Cook* that the extension of *Garrity* to cover routine law enforcement reports would create an undue burden to the system of criminal justice. Nothing in *Garrity* suggests that a corrections officer must be given warnings or promised immunity every time he writes a routine report.

Second, courts have held that *Garrity* does not require the suppression of false statements that amount to an obstruction of justice. In *United States v. Veal*, 153 F.3d 1233 (11th Cir. 1998), the Eleventh Circuit held that "[a]n accused may not abuse *Garrity* by committing a crime involving false statements and thereafter rely on *Garrity* to provide a safe haven by foreclosing any subsequent use of such statements in a prosecution for perjury, false statements or obstruction of justice." *Id.* at 1243. The Second Circuit likewise has held that "while a public employee may not be put to the Hobson's Choice of self-incrimination or unemployment, he is not privileged to resort to the third alternative, i.e., lying." *United States ex rel. Annunziato v. Deegan*, 440 F.2d 304, 306 (2d Cir. 1971). In this case, the government does not seek to introduce Defendants' statements to prove that excessive force was used during the incident itself. In fact, the statements indicate that no excessive force was used. Instead, the statements form the basis for an independent criminal charge – obstruction of justice – because the government alleges that the statements are false. Defendants may not exclude their

1. alleged false statements by relying on *Garrity*.
2. **IT IS ORDERED** that Defendants' motions to suppress (Docs. 33, 35) are
3. **denied.**
4. Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 6/7/2013 to
5. 8/14/2013.
6.     Dated this 15th day of August, 2013.

                                        David G. Campbell
                                        United States District Judge